**Joseph G. Sansone**
**Chief, Market Abuse Unit**
**Julia C. Green**
**Jennifer Chun Barry***
**Assunta Vivolo**
**David W. Snyder***
**SECURITIES AND EXCHANGE COMMISSION**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**greenju@sec.gov**
**\*Not admitted in the U.S. District Court for the Southern District of New York**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **18-CV-____ (___)** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **RICHARD T. CUNNIFFE,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendant Richard T. Cunniffe ("Cunniffe") and alleges as follows:

## SUMMARY

1.    This matter involves an unlawful, serial insider trading scheme orchestrated by three financial industry professionals, in which investment banker Sean R. Stewart ("S. Stewart") tipped material, nonpublic information to his father accountant Robert K. Stewart ("R. Stewart"), who partnered with his friend a professional trader, Cunniffe, to exploit this information by placing highly profitable securities trades.

2.      As an investment banker at two prominent investment banks, S. Stewart learned

nonpublic information about future mergers and acquisitions involving clients of these

investment banks.  From 2010 to 2014, on at least six occasions, S. Stewart tipped his father R.

Stewart about imminent mergers or acquisitions so that his father could benefit from this

valuable information, and on four of these occasions, R. Stewart further tipped the information to

Cunniffe.  Cunniffe used the information to place trades in his own accounts and generated

approximately $1.1 million in illicit proceeds which he shared with R. Stewart.

3.      R. Stewart knew that because of his undeniable relationship with his son, he

needed to recruit a partner who would trade in his stead to conceal his trading activity.  To this

end, R. Stewart approached Cunniffe, and the two men agreed that Cunniffe would trade in

Cunniffe's account and then split the illicit profits with R. Stewart.

4.      Cunniffe and R. Stewart attempted to conceal their illegal trading and evade

detection by: (a) favoring in-person meetings to discuss the scheme; (b) using coded email

messages to discuss the scheme; (c) spreading trades over numerous stock options series in an

attempt to avoid regulatory scrutiny; (d) buying stock options during periods when these

securities were more heavily traded in order to blend into the daily volume; (e) refraining from

options trading too close to the expected announcement date of a merger or acquisition; and (f) in

most instances, sharing the illicit profits through cash payments.

5.      By this Complaint, the Commission now charges defendant Cunniffe with illegal

insider trading in violation of the federal securities laws.  By knowingly or recklessly engaging

in the conduct described in this Complaint, Cunniffe violated and, unless restrained and enjoined

by the Court, will continue to violate Sections 10(b) and 14(e) of the Securities Exchange Act of

1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)], and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1], to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

7.      This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

8.      Venue in this District is proper because defendant transacts business in the Southern District of New York, and a substantial part of the events giving rise to this action occurred in the Southern District of New York.

9.      In connection with the conduct alleged in this Complaint, defendants made use of a means or instrumentality of interstate commerce, of the mails, or of a facility of any national securities exchange.

## COMMONLY-USED TRADING TERMS

10.      A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

11.      A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified strike price within a specific time period.

Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

## DEFENDANT

12.     **Richard T. Cunniffe**, age 63, resides in Medford, NY.  Cunniffe has spent almost his entire career in the securities industry and has held Series 7, 24, and 63 licenses.  While working at a real estate and property development company, Cunniffe met and became friends with R. Stewart.  R. Stewart recruited Cunniffe to place trades on the material, nonpublic information R. Stewart received from his son, S. Stewart.  From June 2012 until March 2015, Cunniffe was a managing director at a registered broker-dealer headquartered in Greenwich, CT.

## RELATED PERSONS AND ENTITIES

13.     **Sean R. Stewart**, age 37, is R. Stewart's son.  During the relevant time period, S. Stewart worked at Investment Bank #1 from approximately July 2006 until October 12, 2011, and at Investment Bank #2 from October 17, 2011 to approximately June 4, 2015.

14.     **Robert K. Stewart**, age 63, is S. Stewart's father.  R. Stewart is a CPA licensed in the state of New York and a founder of a CPA firm located in New York, NY.

15.     Dionex Corp. ("**Dionex**") is a manufacturer of analytical instruments and related accessories incorporated in Delaware with its principal place of business in Sunnyvale, CA.  At all relevant times its shares were publicly traded on the NASDAQ under the symbol "DNEX."

16.     Kendle International, Inc. ("**Kendle**") is a clinical research organization incorporated in Ohio with its principal place of business in Cleveland, OH.  At all relevant times its shares were publicly traded on the NASDAQ under the symbol "KNDL."

17.     Kinetic Concepts, Inc. ("**Kinetic**") is a maker of wound-care products and hospital beds incorporated in Texas with its principal place of business in San Antonio, TX.  At all relevant times Kinetic was traded on the New York Stock Exchange under the symbol "KCI."

18.     Gen-Probe, Inc. ("**Gen-Probe**") is a molecular diagnostics products and services company incorporated in Delaware with its principal place of business in San Diego, CA.  At all relevant times Gen-Probe was traded on the NASDAQ under the symbol "GPRO."

19.      Lincare Holdings, Inc. ("**Lincare**") is a home respiratory healthcare company incorporated in Delaware with its principal place of business in Clearwater, FL.  At all relevant times Lincare was traded on the NASDAQ under the symbol "LNCR."

20.     CareFusion Corp. ("**CareFusion**") is a medical technology company incorporated in Delaware with its principal place of business in San Diego, CA.  At all relevant times CareFusion was traded on the New York Stock Exchange under the symbol "CFN."

21.     **Investment Bank #1** is a Delaware limited liability company that maintains an office in New York, NY.  It is a registered broker-dealer pursuant to Section 15(b) of the Exchange Act.  Investment Bank #1 was a financial adviser on transactions described below involving: (a) Dionex; (b) Kendle; and (c) Kinetic.  S. Stewart was employed at Investment Bank #1 at the time that each of these transactions took place and remained employed there until approximately October 12, 2011.

22.     **Investment Bank #2** is a Delaware limited partnership that maintains an office in New York, NY.  It is a registered broker-dealer pursuant to Section 15(b) of the Exchange Act.  Investment Bank #2 was a financial adviser on transactions described below involving: (a) Gen-Probe; (b) Lincare; and (c) CareFusion.  S. Stewart was employed at Investment Bank #2 at the time each of these transactions took place.

## THE INSIDER TRADING SCHEME

23.     S. Stewart worked as an investment banker for Investment Bank #1 from July 2006 to October 12, 2011.  From October 17, 2011 to approximately June 4, 2015, S. Stewart worked as an investment banker at Investment Bank #2.  As an investment banker at these firms, S. Stewart learned material, nonpublic information about the firms' clients and potential mergers and/or acquisitions the firms' clients were contemplating.

24.     On at least six different occasions, S. Stewart tipped his father R. Stewart material, nonpublic information about impending mergers and/or acquisitions so that his father could profitably invest in the companies that were about to be acquired.  On four of these occasions, R. Stewart in turn tipped Cunniffe so that Cunniffe could place trades based on material, nonpublic information and share the profits with R. Stewart.

25.     In tipping this material, nonpublic information to his father, S. Stewart repeatedly breached the duty of trust and confidence he owed to his employer.  On at least three of these occasions S. Stewart was working for the company who was the target of the acquisition.  In these instances, he also breached a duty that he owed to the shareholders of those companies.

26.     On two occasions, R. Stewart used his son's tips to trade in his own account. Later, to conceal his trading, R. Stewart solicited his friend, Cunniffe, to purchase options in companies that S. Stewart advised were about to be acquired.  All told, R. Stewart and Cunniffe made more than $1.1 million in illicit proceeds trading on the material, nonpublic information S. Stewart obtained through his work at Investment Bank #1 and Investment Bank #2.

### A.  R. Stewart's Illegal Trading in Dionex and Kendle

27.     In late 2010 and early 2011, S. Stewart tipped his father R. Stewart with material, nonpublic information that he obtained through his employment at Investment Bank #1 concerning the acquisitions of Dionex and Kendle.  Based on his son's tips, R. Stewart purchased

6

Dionex and Kendle stock in advance of these companies' respective acquisitions being announced to the public.

28.     On December 13, 2010, the Dionex acquisition was publicly announced. As a result of his illegal purchase of Dionex stock, R. Stewart made profits of approximately $3,676.

29.     On May 5, 2011, the Kendle acquisition was publically announced.  As a result of his illegal purchase of Kendle stock, R. Stewart made profits of approximately $7,887.

30.     Shortly after the public announcement of the Kendle acquisition, R. Stewart told Cunniffe that he had received advance notice that Kendle was going to be acquired.

**B.   The Kinetic Transaction Tip: R. Stewart Recruits Cunniffe to Participate in the Insider Trading Scheme**

31.     On March 29, 2011, Kinetic forwarded to Investment Bank #1 an unsolicited proposal letter from Apax Partners LLP ("Apax") offering to buy Kinetic's outstanding common stock for between $63 and $65 per share, and Investment Bank #1 began advising Kinetic about this transaction.

32.     Although S. Stewart did not personally begin to work on the Kinetic transaction until June 10, 2011, he learned material, nonpublic information about this proposed transaction by at least late March 2011.  At or around this time, S. Stewart helped coordinate assignments for some junior employees at Investment Bank #1.  This position allowed S. Stewart to learn about potential acquisitions in which he was not directly involved.  For example, on March 30, 2011, an Investment Bank #1 colleague who was working on the Kinetic transaction sent an email to S. Stewart stating: "[Investment Bank #1 analyst] will work on the Kinetic project."

33.     On April 3, 2011, S. Stewart emailed a different colleague, who was working on the Kinetic transaction and asked, "Kci alright?"  The colleague replied, in part:  "KCI is going ok. Working away."

7

34.     On April 23, 2011, S. Stewart emailed that same colleague saying:  "Also fyi: I mentioned to [an individual] that [a managing director and a vice president working on the Kinetic transaction] were very pleased thus far for all of your work on KCI (I had spoken w/ both of them last week) and that you were doing a really good job."

35.     Prior to April 25, 2011, S. Stewart tipped his father, R. Stewart, that Kinetic was likely to be acquired.

36.     In or around April 2011, R. Stewart asked Cunniffe to purchase Kinetic options for him in Cunniffe's brokerage account.  R. Stewart told Cunniffe that there was going to be news soon about Kinetic.  R. Stewart explained that he wanted Cunniffe to purchase the securities because R. Stewart was "too close to the source."

37.     Shortly thereafter, Cunniffe began purchasing Kinetic call options.  Between April 25, 2011 and June 27, 2011, Cunniffe purchased a total of 365 Kinetic call options spread out over five different options series.  Specifically, Cunniffe purchased the following Kinetic call options in his individual brokerage account:

| Kinetic Options Series | Date(s) Purchased | Quantity Purchased |
|---|---|---|
| (1) Kinetic May $60 Call | 4/25/2011 | 20 |
| (2) Kinetic June $62.50 Call | 5/17/2011 - 5/24/2011 | 80 |
| (3) Kinetic July $60 Call | 6/3/2011 - 6/27/2011 | 40 |
| (4) Kinetic July $62.50 Call | 6/6/2011 | 50 |
| TOTAL | | 190 |

38.     Cunniffe also purchased the following Kinetic options in his IRA brokerage account:

| Kinetic Options Series | Date(s) Purchased | Quantity Purchased |
|---|---|---|
| (1) Kinetic May $60 Call | 4/25/2011 | 20 |

8

| (2) Kinetic June $60 Call | 5/20/2011 | 5 |
| (3) Kinetic June $62.50 Call | 5/20/2011 - 5/24/2011 | 70 |
| (4) Kinetic July $60 Call | 6/3/2011 - 6/27/2011 | 30 |
| (5) Kinetic July $62.50 Call | 6/6/2011 | 50 |
| **TOTAL** | | **175** |

39.　　On May 4, 2011, Apax increased its offer to acquire all of Kinetic's outstanding common stock from $70 to $72 per share.  That same day, at 5:12 p.m., R. Stewart called S. Stewart at Investment Bank #1, and father and son spoke for approximately two minutes.

40.　　On July 13, 2011, Kinetic announced that Apax had agreed to acquire Kinetic for $68.50 per share.  That day, Kinetic's stock price closed at $68.23 per share, an increase of $3.74 per share, or approximately 6%, over the prior trading day's closing price of $64.49 per share.  In addition, Kinetic's trading volume increased by over 2,933%, from 1.2 million shares on the trading day prior to the announcement to 36.4 million shares on July 13, 2011.

41.　　The Kinetic May $60 call options, June $60 call options, and June $62.50 call options that Cunniffe purchased in his individual and IRA accounts had expired prior to the public announcement of the Kinetic transaction.

42.　　On July 14, 2011, Cunniffe sold the remaining 170 Kinetic call options, making a profit of approximately $108,000.

43.　　Cunniffe paid R. Stewart the profits associated with the Kinetic options trades that Cunniffe had executed on R. Stewart's behalf.

44.　　 In or about July 2011, after Kinetic announced it was being acquired, Cunniffe told R. Stewart that he had noticed that both times R. Stewart said he had information about a

stock, the company ended up being acquired.  R. Stewart told Cunniffe that the information was coming from his son, whom he did not identify by name.

45.     Later, in or around the spring/summer of 2012, R. Stewart told Cunniffe that S. Stewart had provided the information about the stocks they purchased, and that S. Stewart worked on Wall Street on the "sell side."

**C.  Cunniffe and R. Stewart Agree to Trade on Inside Information Using Cunniffe's Brokerage Account**

46.     After the Kinetic transaction but before the Gen-Probe transaction, discussed below, R. Stewart and Cunniffe agreed that they would use the material, nonpublic information that R. Stewart obtained from S. Stewart to execute trades in Cunniffe's individual brokerage account and split the illicit profits.  At some point, Cunniffe told R. Stewart he was placing similar trades in his IRA account for himself.

47.     To conceal their arrangement, Cunniffe paid R. Stewart his share of the illicit profits through numerous in-person cash payments over an extended period of time.

48.     In addition, Cunniffe and R. Stewart took a variety of other steps to prevent their illegal insider trading scheme from being discovered.  For example, when discussing trades, Cunniffe and R. Stewart primarily met in person.  Occasionally, they discussed the scheme on the phone or in coded email messages, often using "golf" references to discuss aspects of the scheme.

49.     Cunniffe and R. Stewart also employed several trading strategies to disguise the fact that they were trading on material, nonpublic information.  For example, Cunniffe spread his trades over numerous options series so as to not raise suspicion by placing a large bet in one particular series.  Cunniffe further attempted to avoid detection by refraining from buying options too close to the expected announcement date.

### D. **The Gen-Probe Transaction Tip**

50.     On March 7, 2012, Hologic engaged Investment Bank #2 to advise it on a potential acquisition of Gen-Probe at a price of $80 to $85 per share.  That same day, Investment Bank #2 assigned S. Stewart to work on the Gen-Probe transaction.  Upon being assigned to work on this engagement, S. Stewart learned material, nonpublic information about the transaction, including the anticipated (per share) purchase price and the identity of the participants in the transaction.

51.     Prior to April 19, 2012, S. Stewart tipped his father, R. Stewart, that Gen-Probe was likely to be acquired.  Subsequently, R. Stewart relayed this tip to Cunniffe.

52.     As with the Kinetic transaction, R. Stewart asked Cunniffe to purchase Gen-Probe options in Cunniffe's account for R. Stewart.  Pursuant to the agreement discussed above, Cunniffe agreed to purchase the options using his own funds and split the profits with R. Stewart.

53.     On the morning of April 18, 2012, R. Stewart and Cunniffe had a two-minute telephone call.  The next day, April 19, 2012, Cunniffe began to purchase Gen-Probe call options.  Between April 19 and April 27, 2012, Cunniffe purchased a total of 320 Gen-Probe call options spread out over seven different options series.  Specifically, Cunniffe purchased the following Gen-Probe call options in his individual brokerage account:

| Gen-Probe Options Series | Date(s) Purchased | Quantity Purchased |
|---|---|---|
| (1) GPRO May $80 Call | 4/27/2012 | 20 |
| (2) GPRO June $70 Call | 4/26/2012 | 10 |
| (3) GPRO June $75 Call | 4/26/2012 - 4/27/2012 | 40 |
| (4) GPRO June $80 Call | 4/27/2012 | 30 |
| (5) GPRO Aug. $75 Call | 4/19/2012 - 4/24/2012 | 40 |
| **TOTAL** | | **140** |

54.     Cunniffe purchased the following Gen-Probe call options in his IRA account:

| Gen-Probe Options Series | Date(s) Purchased | Quantity Purchased |
| --- | --- | --- |
| (1) GPRO May $70 Call | 4/23/2012 | 20 |
| (2) GPRO May $75 Call | 4/23/2012 | 40 |
| (3) GPRO June $70 Call | 4/26/2012 | 30 |
| (4) GPRO June $75 Call | 4/27/2012 | 30 |
| (5) GPRO Aug. $75 Call | 4/24/2012 | 60 |
| TOTAL | | 180 |

55.     On April 30, 2012, Gen-Probe and Hologic announced that Hologic had agreed to acquire Gen-Probe for $82.75 per share, or $3.72 billion.  That day, Gen-Probe's stock price closed at $81.55 per share, an increase of $12.84 per share, or approximately 19%, over the prior trading day's closing price of $68.72 per share.  In addition, Gen-Probe's trading volume increased by over 5,234% from 355,399 shares on the trading day prior to the announcement to 18.96 million shares on April 30.

56.     Between May 2 and May 10, 2012, Cunniffe sold the 320 Gen-Probe options that he had acquired in his individual and IRA accounts, making profits of approximately $188,000.

57.     Cunniffe paid R. Stewart his share of the illicit Gen-Probe transaction profits principally in cash payments.

**E.  The Lincare Tender Offer Tip**

58.     On May 24, 2012, the Linde Group, a German industrial gas company, contacted Investment Bank #2 to discuss the possibility of Investment Bank #2 advising Linde Group on a potential acquisition of Lincare.

59.     From this point forward, Investment Bank #2 advised the Linde Group on this acquisition.  Through his employment at Investment Bank #2, S. Stewart learned that the Linde

12

Group was exploring an acquisition of Lincare.  Prior to May 27, 2012, S. Stewart tipped his father, R. Stewart, that Lincare was likely to be acquired.

60.     In May 2012, R. Stewart relayed this tip to Cunniffe.  On May 27, 2012, at 9:35 p.m., which was the Sunday of Memorial Day weekend, R. Stewart sent Cunniffe a coded email stating, in part: "might have an opportunity to play golf- but would need to book the reservation as soon as the office opens Tuesday morning."

61.     Cunniffe began purchasing Lincare options on the morning of Tuesday, May 29, 2012.  Between May 29 and June 28, 2012, Cunniffe bought a total of 375 Lincare call options spread out over seven different options series.  Specifically, in his individual brokerage account, Cunniffe bought the following Lincare call options:

| Lincare Options Series | Date(s) Purchased | Quantity Purchased |
| --- | --- | --- |
| (1) LNCR June $24 Call | 5/29/2012 | 25 |
| (2) LNCR June $25 Call | 5/29/2012 | 25 |
| (3) LNCR July $24 Call | 5/29/2012 - 6/12/2012 | 30 |
| (4) LNCR July $25 Call | 5/29/2012 - 6/13/2012 | 45 |
| (5) LNCR July $26 Call | 6/21/2012 | 10 |
| (6) LNCR July $27 Call | 6/21/2012 | 20 |
| (7) LNCR July $35 Call | 6/28/2012 | 10 |
| TOTAL | | 165 |

62.     Cunniffe also bought the following Lincare call options in his IRA account:

| Lincare Options Series | Date(s) Purchased | Quantity Purchased |
| --- | --- | --- |
| (1) LNCR June $24 Call | 5/29/2012 | 25 |
| (2) LNCR June $25 Call | 5/29/2012 | 25 |
| (3) LNCR July $24 Call | 5/29/2012 - 6/12/2012 | 45 |
| (4) LNCR July $25 Call | 5/29/2012 - 6/12/2012 | 45 |
| (5) LNCR July $26 Call | 6/21/2012 | 20 |

13

| (6) LNCR July $27 Call | 6/21/2012 | 40 |
| (7) LNCR July $35 Call | 6/28/2012 | 10 |
| **TOTAL** | | **210** |

63.     Prior to the public announcement that the Linde Group was purchasing Lincare

through a tender offer, between June 14 and June 15, 2012, Cunniffe sold the 50 Lincare June

$24 call options and the 50 Lincare June $25 call options for a profit of approximately $5,574,

and $589, respectively.

64.     Between May 23 and May 29, 2012, Linde Group and Lincare, negotiated the

terms of an amended confidentiality agreement, and on May 29, 2012, they executed the

amended confidentiality agreement.  From May 29, 2012 until the announcement of the merger

agreement on July 1, 2012, the Linde Group conducted due diligence on Lincare.

65.     On June 27, 2012, the Financial Times reported that Linde Group might acquire

Lincare.  Later that day, Cunniffe spoke to R. Stewart on the telephone for thirteen minutes, and

shortly thereafter R. Stewart and Cunniffe exchanged two more phone calls.  The following day,

June 28, 2012, Cunniffe bought 20 Lincare July $35 call options.

66.     On July 1, 2012, after the close of regular market trading, the Linde Group

announced that it had agreed to acquire Lincare for $41.50 per share, or $3.8 billion, through a

tender offer.  On July 2, 2012, the first trading day after the public announcement, Lincare's

stock price closed at $41.34 per share, an increase of $7.32 per share, or approximately 22%,

over the prior trading day's closing price of $34.02 per share.  In addition, Lincare's trading

volume increased by over 851%, from 8.9 million shares on the trading day prior to the

announcement to 84.65 million shares on July 2, 2012.

67.     On July 6, 2012, Cunniffe sold his remaining 275 Lincare call options, making a

profit of approximately $409,000.  Sixteen minutes after Cunniffe sold the last of the Lincare call

options, he sent an email to R. Stewart saying, "I ment [sic] to tell you and your wife to have a celebration drink on me! I have some good news for you when you get back."  A few minutes later, R. Stewart replied using the same golf-related code he had used in his email of May 27, 2012.  R. Stewart stated: "Thanks Rick- saw local story about high cost of golf reservations since a foreign company purchased all- even more expensive than imagined."

68.     Like the Kinetic and Gen-Probe transactions, Cunniffe paid R. Stewart his share of the illicit profits from the Lincare tender offer tip, with incremental cash payments slowly over time and through a few checks.

**F.   The CareFusion Transaction Tip**

69.     On March 7, 2014, healthcare company Becton Dickinson contacted CareFusion and indicated that it was interested in acquiring CareFusion.  On April 23, 2014, Investment Bank #2 signed an engagement letter to advise CareFusion in connection with the potential CareFusion transaction.

70.     On March 7, 2014, S. Stewart was assigned to work on the CareFusion transaction.  Upon being assigned to work on this engagement, S. Stewart learned material, nonpublic information about the transaction, including the anticipated (per share) purchase price and the identity of the participants in the transaction.  Prior to August 19, 2014, S. Stewart tipped his father, R. Stewart, that CareFusion was likely to be acquired.

71.     On August 1, 2014, Becton Dickinson submitted a written, non-binding, preliminary indication of interest in potentially acquiring CareFusion at a price range of $53 to $55 per share.

72.     On Sunday, August 17, 2014, Cunniffe and R. Stewart exchanged emails to arrange an in-person meeting.

73.     On August 18, 2014, CareFusion and Becton Dickinson entered into a mutual non-disclosure and standstill provision.  That same day, Becton Dickinson began due diligence.

74.     On August 18, 2014, Cunniffe emailed R. Stewart stating:  "I will be in the city tomorrow, probably late morning.  I'll touch base with you in the morning."  R. Stewart replied, "Thanks- let me know and we can meet up quickly."

75.     On August 19, 2014 at approximately 2:00 p.m., Cunniffe met R. Stewart in Midtown Manhattan.  At or around the time of this meeting, R. Stewart tipped Cunniffe regarding the potential acquisition of CareFusion.

76.     Later that same day, at approximately 3:53 p.m., Cunniffe began buying CareFusion call options.  Between August 19 and October 2, 2014, Cunniffe bought a total of 630 CareFusion call options spread out over eleven different options series.  Specifically, in two individual brokerage accounts, Cunniffe bought the following CareFusion call options:

| CareFusion Options Series | Date(s) Purchased | Quantity Purchased |
|---|---|---|
| (1) CFN Sept. $46 Call | 8/21/2014 | 10 |
| (2) CFN Oct. $46 Call | 9/16/2014 - 9/25/2014 | 55 |
| (3) CFN Oct. $47 Call | 8/21/2014 - 9/22/2014 | 40 |
| (4) CFN Oct. $48 Call | 9/12/2014 - 9/16/2014 | 40 |
| (5) CFN Oct. $49 Call | 8/29/2014 - 9/3/2014 | 60 |
| (6) CFN Nov. $45 Call | 10/2/2014 | 5 |
| (7) CFN Nov. $46 Call | 9/25/2014 - 10/2/2014 | 35 |
| (8) CFN Nov. $47 Call | 9/22/2014 | 10 |
| (9) CFN Dec. $48 Call | 9/12/2014 - 9/15/2014 | 25 |
| (10) CFN Dec. $49 Call | 8/25/2014 - 8/28/2014 | 20 |
| (11) CFN Dec. $50 Call | 9/2/2014 - 9/3/2014 | 30 |
| **TOTAL** | | **330** |

77.     Cunniffe bought the following CareFusion call options in his IRA account:

| CareFusion Options Series | Date(s) Purchased | Quantity Purchased |
|---|---|---|
| (1) CFN Sept. $46 Call | 8/21/2014 | 10 |
| (2) CFN Oct. $46 Call | 9/16/2014 - 9/25/2014 | 50 |
| (3) CFN Oct. $47 Call | 8/21/2014 - 9/22/2014 | 40 |
| (4) CFN Oct. $48 Call | 9/12/2014 - 9/16/2014 | 30 |
| (5) CFN Oct. $49 Call | 8/29/2014 - 9/3/2014 | 60 |
| (6) CFN Nov. $45 Call | 10/2/2014 | 5 |
| (7) CFN Nov. $46 Call | 9/25/2014 - 10/2/2014 | 35 |
| (8) CFN Nov. $47 Call | 9/22/2014 | 10 |
| (9) CFN Dec. $48 Call | 8/19/2014 | 10 |
| (10) CFN Dec. $49 Call | 8/25/2014 - 8/28/2014 | 20 |
| (11) CFN Dec. $50 Call | 9/2/2014 - 9/3/2014 | 30 |
| **TOTAL** | | **300** |

78.     Prior to the public announcement of the CareFusion transaction, Cunniffe sold the 20 CareFusion Sept. $46 call options and the 120 CareFusion October $49 call options for a small profit of $429 and a small loss of approximately $4,144, respectively.

79.     On October 5, 2014, Becton Dickinson announced that it had agreed to acquire CareFusion for $58 per share in cash and stock.  On October 6, 2014, the first trading day after the public announcement, CareFusion's stock price closed at $56.75 per share, an increase of $10.58 per share, or approximately 23%, over the prior trading day's closing price of $46.17 per share.  In addition, CareFusion's trading volume increased by over 4,261%, from 1.16 million shares on the trading day prior to the announcement to 50.59 million shares on October 6, 2014.

80.     Between October 7 and October 9, 2014, Cunniffe sold the remaining 490 CareFusion call options, making a profit of approximately $429,000.

81.     In late 2014, Cunniffe paid R. Stewart a portion of R. Stewart's share of the Carefusion profits.  On March 24, 2015, Cunniffe paid R. Stewart the remaining $2,500 in CareFusion profits he owed him at a meeting in a Manhattan diner.

## CUNNIFFE VIOLATED THE FEDERAL SECURITIES LAWS

82.     As detailed above, on multiple occasions S. Stewart tipped R. Stewart with material, nonpublic information about impending mergers and acquisitions that R. Stewart used to trade in his own account on two occasions and tipped to Cunniffe on four occasions.  A reasonable investor would have viewed the inside information, and each component thereof, as being important to his or her investment decision.

83.     During the course of his employment at Investment Bank #1 and Investment Bank #2, S. Stewart obtained the material, nonpublic information that he tipped to his father so that his father could place profitable securities trades.  Each of the tips that S. Stewart provided to R. Stewart was conveyed in breach of a duty or similar relationship of trust or confidence that S. Stewart owed to his employers and/or their clients.

84.     When S. Stewart tipped the material, nonpublic information to his father, R. Stewart assumed his son's duties to keep the information confidential and to refrain from trading on it or tipping it to others.  R. Stewart knowingly or recklessly breached these duties by:

     a.  trading on the basis of that information in connection with the Dionex tender offer and the Kendle transaction; and

     b.  tipping the material, nonpublic information in connection with the Kinetic transaction, the Gen-Probe transaction, the Lincare tender offer, and the

CareFusion transaction, to his friend, Cunniffe, expecting that Cunniffe would trade on the basis of that information and split the profits from that trading.

85.     Cunniffe knew or recklessly disregarded that the information tipped to him by R. Stewart was material and nonpublic.

86.     At all relevant times, Cunniffe knew, should have known, consciously avoided knowing, or was reckless in not knowing that the material, nonpublic information R. Stewart tipped him had been disclosed in breach of a fiduciary duty or other duties of trust or confidence, or otherwise misappropriated.

87.     When R. Stewart tipped the material, nonpublic information to Cunniffe, Cunniffe assumed the duties to keep the information confidential and to refrain from trading on it or tipping it to others.  Cunniffe knowingly or recklessly breached these duties by trading on the basis of that information.

88.     Cunniffe knew or recklessly disregarded that he was not permitted to trade on the basis of this material, nonpublic information.

## CLAIMS FOR RELIEF

### Cunniffe's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

89.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-88 inclusive, as if they were fully set forth herein.

90.     The information R. Stewart passed to Cunniffe regarding the Kinetic, Gen-Probe, Lincare, and CareFusion transactions, and each component thereof, was material and nonpublic.

91.     At all times relevant to this Complaint, Cunniffe acted knowingly or recklessly.

92.     By engaging in the conduct described above, Cunniffe directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

93.     By reason of the foregoing, Cunniffe violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

**Cunniffe's Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder**

94.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-93 inclusive, as if they were fully set forth herein.

95.     As of May 29, 2012, the date of the first illegal trade in Lincare securities alleged herein, substantial steps to complete the Linde Group's tender offer to acquire Lincare had already been taken.  Specifically, the companies had retained financial advisers and legal counsel, executed a confidentiality agreement, and had begun conducting due diligence.

96.     Cunniffe knew or had reason to know that the information R. Stewart tipped him regarding the Lincare tender offer was nonpublic information that had been acquired from someone working on behalf of the offeror or issuer.

20

97.     At the time Cunniffe traded in Lincare securities as described herein, he was in possession of material, nonpublic information regarding the Lincare tender offer that he knew or had reason to know was nonpublic and acquired directly or indirectly from a someone working on behalf of the offeror or issuer.

98.     By reason of the foregoing, Cunniffe violated and, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter final judgment:

### I.

Permanently restraining and enjoining defendant Cunniffe from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and from engaging in conduct in violation of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

### II.

Ordering Cunniffe to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### III.

Ordering Cunniffe to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Date:   July 25, 2018

Julia C. Green
Joseph G. Sansone
Assunta Vivolo
Jennifer Chun Barry*
David W. Snyder*
U.S. Securities and Exchange Commission
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(267) 602-2133
greenju@sec.gov

*Not admitted in the S.D.N.Y.